# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## CASE NO. 17-20499-CIV-GOODMAN
### [CONSENT CASE]

SAMIR GHARFEH,

     Plaintiff,

v.

CARNIVAL CORPORATION, et al.,

     Defendants,

_____/

## <u>ORDER ON DEFENDANT'S MOTION TO DISMISS</u>

Defendant Carnival Corporation has filed a motion to dismiss the Complaint filed by Plaintiff Samir Gharfeh. [ECF Nos. 1; 12]. Gharfeh filed an opposition response, and Carnival filed a reply. [ECF Nos. 22; 26]. For the reasons outlined below, the Undersigned **grants the motion in small part and denies it in large part**. Plaintiff has 14 days from the date of this Order to file an optional amended complaint.

## I.    Factual and Procedural Background

Gharfeh's lawsuit arises from a cruise he took as a passenger aboard the Carnival *Freedom* in February 2016. At bottom, it focuses on the care and treatment he received (or did not receive) while aboard the ship. Although the Complaint is comparatively long (at slightly more than 39 pages), the gist of it can be summarized succinctly:

Gharfeh alleges that, during the cruise, he experienced lower abdominal pain

consistent with his past flares of diverticulitis. The ship's medical staff and Carnival's shipboard physician, Defendant Catalina Carvajal, M.D., refused to provide Gharfeh's son, who is a physician, with antibiotics without a prior written prescription, so that he could give them to his father. Gharfeh alleges that he became febrile and that his blood pressure began to drop overnight. But both the medical center and Dr. Carvajal nevertheless refused to give Gharfeh's doctor son the appropriate antibiotics.

Carnival's medical team ultimately transferred Gharfeh to the medical center, and Dr. Carvajal (a co-defendant who apparently has never been served with the Complaint and who has not filed a substantive response to it) diagnosed Gharfeh with a small bowel obstruction. Gharfeh once again became febrile and his blood pressure dropped overnight. After the ship docked in Galveston, Texas the next day, his vitals started to crash, and Dr. Carvajal put Gharfeh on pressors through a peripheral IV.

Gharfeh was then transported to the University of Texas Medical Branch and was placed on a central line, intubated, and taken for a CT scan, which confirmed that he had perforated diverticulitis. Gharfeh alleges that Defendants' misdiagnosis and delay in proper treatment allowed the diverticulitis to "cause[] bowl [sic] perforation which in turn spread the infection into [his] gut causing septic shock" and resulted in a series of surgeries and complications. [ECF No. 1, pp. 17–18 ¶ 40].

Gharfeh asserted five counts against Carnival: (1) Negligent Medical Treatment – Vicarious Liability (Count I); (2) Negligent Provisioning And Equipping of Medical

Facility – Direct Liability (Count III); (3) Negligent Failure to Evacuate Passenger and/or Evacuate Passenger Appropriately – Direct Liability (Count IV); (4) Negligent Hiring, Selection, Retention, Monitoring, and Training of the Onboard Medical Staff – Direct Liability (Count V); and (5) Breach of Third Party Beneficiary Contract (Count VI). He also alleged a negligence claim against Dr. Carvajal under Count II.

## II.  Carnival's Arguments in Support of its Motion to Dismiss

First, Carnival argues that Count I should be dismissed for three reasons: (1) it improperly consolidates multiple claims into a single count, in violation of Federal Rule of Civil Procedure 10(b); (2) Gharfeh is improperly attempting to hold Carnival directly liable for the purported negligence of its onboard medical personnel and improperly imposing a non-existent duty to warn of the medical center's and staff's limitations; and (3) Gharfeh has failed to plead facts that might plausibly establish the existence of a joint venture between Carnival and its shipboard physicians and medical staff.

Second, Carnival contends that Count II should be dismissed because a shipowner does not have a duty to provide its passengers with medical equipment or to promulgate and enforce policies or procedures concerning medical care.

Third, Carnival says that Count III should be dismissed because Carnival did not have a duty to provide Gharfeh with medical transportation, to evacuate Gharfeh off of the ship, or to divert the ship.

Fourth, Carnival argues that Count IV should be dismissed because (1)

shipowners have no duty to monitor or train onboard physicians or medical staff and (2) Gharfeh has failed to allege ultimate facts supporting a claim for negligent hiring, selection, or retention.

Fifth and finally, Carnival contends that Count V should be dismissed because Gharfeh cannot plausibly allege that *Carnival* breached the contracts with its shipboard physicians and medical staff, contracts that obligated the physicians and staff to provide medical care on the ship.

## III. Legal Standards

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take as true all well-pleaded facts in the complaint and all reasonable inferences drawn from those facts. *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994). "A pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). While detailed factual allegations are not always necessary in order to prevent dismissal of a complaint, the allegations must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A complaint cannot simply contain "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Nor can a complaint just rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). Rather, "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. (quoting *Twombly*, 550 U.S. at 570) (emphasis added); *see also Am. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1288–90 (11th Cir. 2010).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Moreover, when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not "show[n]" -- "that the pleader is entitled to relief." *Id.*

While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. "Dismissal pursuant to Rule 12(b)(6) is not appropriate 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (quoting *Conley*, 355 U.S. at 45–46). Although, as noted, a court must accept as true a plaintiff's allegations, a court may dismiss a complaint on a dispositive issue of law. *Marshall Cnty. Bd. of Educ. v. Marshall*

*Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

**The "Shotgun Pleading" Rule**

Concerning the "shotgun pleading" rule -- a common defense challenge and one that Carnival is pursuing here -- the Eleventh Circuit provided a comprehensive guide to the applicable rules in *Weiland v. Palm Beach County Sheriff's Office,* 792 F.3d 1313 (11th Cir. 2015). Rule 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." And Rule 10(b) further provides that "a party must state its claims or defenses in numbered paragraphs, each limited to a single set of circumstances." Recognizing that courts sometimes used the term "shotgun pleading" to simply mean "poorly drafted complaint," the *Weiland* Court identified four types of shotgun pleadings. *Weiland*, 792 F.3d at 1321.

The "unifying characteristic" of all categories of impermissible shotgun pleadings is "that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.

Only one category of "shotgun pleading" is at issue here: the third type, which "commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* at 1322–23; *see Bickerstaff Clay Prods. Co. v. Harris Cty.,* 89 F.3d 1481, 1485 n.4 (11th Cir. 1996) (explaining that complaint was "a typical shotgun pleading" because "some of the counts present more than one discrete claim for relief"). A

dismissal under Rules 8(a)(2) and 10(b) is appropriate "where 'it is *virtually impossible*' to know which allegations of fact are intended to support which claim(s) for relief." *Weiland*, 792 F.3d at 1325 (emphasis in original).

Our Circuit very recently explained yet again the analysis required for shotgun pleadings in *Vibe Micro, Inc. v. Shabanets*, No. 16-15276, 2018 WL 268849 (11th Cir. Jan. 3, 2018). In that case, the Court noted that "Courts in the Eleventh Circuit have little tolerance for shotgun pleadings" because "[t]hey waste scarce judicial resources, inexorably broaden[] the scope of discovery, wreak havoc on appellate court dockets, and undermine[] the public's respect for the courts." *Id*. at *2 (internal quotations omitted). The Court also explained that a district court's "inherent authority to control its docket and ensure the prompt resolution of lawsuits" includes the "ability to dismiss a complaint on shotgun pleading grounds." *Id*.

### The *Franza* Case

Both Gharfeh and Carnival extensively rely on *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225 (11th Cir. 2014), a comprehensive and detailed treatment of federal general maritime law applied in a medical malpractice setting. *Franza* rejected as "an outdated rule that serves no useful purpose in modern maritime law" a non-binding Fifth Circuit case that many district courts in this Circuit had relied on for several years in rejecting passengers' claims against cruise ships for medical malpractice under a *respondeat superior* theory of vicarious liability: *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364

(5th Cir. 1998). *Franza*, 772 F.3d at 1248. After providing a nuanced historical summary and analysis of general maritime law and its application to medical negligence claims, *Franza* held: "we do not find that the arguments set forth in *Barbetta* justify its broad grant of immunity from vicarious liability in all claims of medical malpractice." *Id.*

The *Franza* Court further held that medical malpractice claims by passengers are also permissible under an *apparent* agency theory of liability, thus allowing a passenger to sue a shipowner for medical negligence "if he can properly plead and prove detrimental, justifiable reliance on the apparent agency of a ship's medical staff-member." *Id.* at 1249.

In addition to discussing the legal viability of passengers' claims against shipowners in a medical malpractice context, *Franza* also discussed myriad policy reasons underlying its holding. Because both sides here rely so heavily on *Franza* and because that case analyzes and discusses many principles which apply here and which render some earlier district court evaluations inapplicable or unhelpful, a full discussion is appropriate.

The appellate court succinctly outlined the facts:

In this maritime negligence dispute, an elderly cruise ship passenger fell and bashed his head while the vessel, the "Explorer of the Seas," was docked at port in Bermuda. The injured traveler, Pasquale Vaglio, was wheeled back onto the ship, where he sought treatment from the onboard medical staff in the ship's designated medical center. Over the next few hours, Vaglio allegedly received such negligent medical attention that his life could not be saved. In particular, the ship's nurse purportedly failed to assess his cranial trauma, neglected to conduct any diagnostic scans, and

released him with no treatment to speak of. The onboard doctor, for his part, failed even to meet with Vaglio for nearly four hours. Tragically, Vaglio died about a week later. Now, Vaglio's daughter, appellant Patricia Franza, seeks to hold the cruise line, Royal Caribbean Cruises, Ltd. [], vicariously liable for the purported negligence of two of its employees, the ship's doctor and its nurse, under one of two theories: actual agency (also termed respondeat superior) or apparent agency.

*Id.* at 1227–28.

*Franza* also provided the procedural context in a straightforward manner:

Franza commenced this suit against Royal Caribbean in the United States District Court for the Southern District of Florida under 28 U.S.C. § 1333 and the general maritime law, but the district court dismissed her complaint in its entirety. First, in disposing of Franza's actual agency claim, the trial court applied a longstanding rule set forth most prominently in [*Barbetta*]. Although the general maritime law of the United States has long embraced the principles of agency law, the so-called "*Barbetta* rule" immunizes a shipowner from respondeat superior liability whenever a ship's employees render negligent medical care to its passengers. The rule confers this broad immunity no matter how clear the shipowner's control over its medical staff or how egregious the claimed acts of negligence. Separately, the trial court dismissed Franza's apparent agency claim as inadequately pled.

*Id.* at 1228.

Ultimately, the Eleventh Circuit held that the law permitted a passenger to bring medical negligence claims against the shipowner under two theories of agency and that Franza's Complaint was sufficient to state those claims. In reaching this result, the appellate court decided many issues and highlighted several policy grounds which are worth highlighting here. The Court will list them in the order in which they appear in the opinion:

1. "[V]icarious liability raises fact-bound questions, and we can discern no sound reason in law to carve out a special exemption for all acts of onboard medical negligence." *Id.*

2. "[A]cross well over a century of maritime tort precedent, the Supreme Court has required maritime principals to answer for the negligence of their onboard agents." *Id.* at 1233.

3. "That maritime law has long incorporated the concept of respondeat superior should come as no surprise" and "[s]hipowners, like other principals, exercise real control over their agents." *Id.* at 1234.

4. "In maritime cases, as elsewhere," it is "manifestly just to hold principals responsible for the conduct they command from their employees." *Id.* (internal quotations omitted).

5. The Court has "before regularly permitted *passengers* to invoke respondeat superior in maritime negligence suits." *Id.* (emphasis in original).

6. There is "nothing inherent in onboard medical negligence, when committed by full-time employees acting within the course and scope of their employment, that justifies suspending the accepted principles of agency." *Id.* at 1235.

7. Nothing in Eleventh Circuit case law "creates—or even suggests—a bright-line zone of immunity for the onboard negligence of a cruise ship's medical employees." *Id.*

8.     "[A]bsent any statutory mandate to the contrary, the existence of an agency relationship is a question of fact under the general maritime law." *Id.* at 1235–36.

9.     "[A]t the pleading stage, a passenger must allege sufficient facts to render it facially plausible that . . . an agency relationship [is] . . . present." *Id.* at 1236 (internal quotations omitted).

10.    "In cases of medical malpractice, as in other maritime respondeat superior cases, the essential element of the relationship is the principal's control over its agents." *Id.*

11.    The Eleventh Circuit recognizes several considerations as "probative" of control in the maritime context:

> (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for an agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent.

*Id.* at 1237.

12.    The passenger ticket contract would not be dispositive of whether the onboard doctor and nurse were independent contractors because their status "depends not on the statements of the parties but upon all the circumstances of their dealings with each other." *Id.* at 1238 (internal citations omitted).

13.    "Instead of nineteenth-century steamships . . ., we now confront state-of-the-art cruise ships that house thousands of people and operate as floating cities,

complete with well-stocked modern infirmaries and urgent care centers." *Id.* at 1239 (internal citations omitted).

14.     Although "ships historically went 'off the grid' when they set sail, modern technology enables distant ships to communicate instantaneously with the mainland in meaningful ways." *Id.*

15.     "Unlike physicians of the past, who often functioned as distinct independent entities and independent centers of occupation and profession, today's medical practitioners routinely work for major conglomerates, corporations and other large associations." *Id.* at 1240 (internal quotations omitted).

16.     "[C]ourts overwhelmingly recognize and apply the principles of vicarious liability in the world of modern medicine." *Id.* at 1241.

17.     "[C]ontrol of the agent by the principal remains the touchstone of the analysis" of whether a medical practitioner is someone else's agent. *Id.*

18.     The appellate court was "particularly skeptical of the view that the patient always holds the critical reins" when he is a passenger on a cruise ship because "[w]ith no land on the horizon, a passenger who falls ill aboard a cruise ship has precious little choice but to submit to onboard care." *Id.* at 1242.

19.     The "hard reality" of a cruise ship passenger seeking medical treatment "is that, at least in the short term, he may have literally nowhere else to go." *Id.*

20.     The Eleventh Circuit was "unpersuaded by the breadth" of the

"immunity-yielding rule of law" that the "nature of a cruise line's expertise renders it unable to supervise a medical professional" and that a "ship is not a floating hospital." *Id.* at 1243. In making this point, the appellate court explained that "it seems to us disingenuous for large cruise lines to disclaim any medical expertise when they routinely provide access to extensive medical care in the infirmaries they have constructed for this very purpose." *Id.*

21.     Although a cruise ship is different from a hospital and the practice of medicine is far more central to hospital operations than to the cruising business, "the scope of an employer's vicarious liability is not limited to negligence arising from its primary business." *Id.* at 1244.

22.     "[N]o principle from maritime tort law justifies treating shipowners so differently from ordinary employers," a point illustrated by the fact that "shipowners have been held vicariously liable for misconduct that falls at least this far outside the heartland of the cruising business." *Id.* at 1246.

23.     "There are also important policy reasons that inform **against** broad immunity for cruise lines against any liability for their medical staff's malpractice." *Id.* at 1246 (emphasis added).

24.     "[C]ruise lines have chosen quite deliberately to enter the business of medicine, often in a large way, and they reap the tangible benefits of this business strategy." *Id.* at 1247.

25.    The Eleventh Circuit is "loath to adopt a principle of law that always immunizes a shipowner without regard to any of the facts." *Id.*

26.    Because it has "long applied the principles of apparent agency in maritime cases," the appellate court could "discern no sound basis for allowing a special exception for onboard medical negligence," especially given that the appellate court "concluded that actual agency principles ought to be applied in this setting as well." *Id.* at 1251.

27.    "Medical negligence triggers the same equitable concerns whether it arises on land or at sea, and, therefore, we think apparent agency may be appropriate in both settings." *Id.*

28.    Because "cruise lines will not always be held to the same standard of care that would guide treatment onshore," the "precise contours" of a cruise ship operator's duty "depends on questions of fact" that "need not and cannot be answered" at the pleadings stage. *Id.* at 1253–54.

## IV.    Analysis

### Count I

Carnival is correct that Count I improperly commingles claims. Count I's title suggests that it contains only a claim for vicarious liability, based on theories of actual agency/respondeat superior, apparent agency/estoppel, and joint venture. But it *also* includes allegations of *direct* negligence. Count I is thus an example of an impermissible

shotgun pleading and it needs to be clarified. Therefore, the Court dismisses Count I, without prejudice, on that ground alone. *See Flaherty v. Royal Caribbean Cruises, Ltd.* No. 15-22295, 2015 WL 8227674, at *3, *5 nn. 3, 10 (S.D. Fla. Dec. 7, 2015) (dismissing as impermissible shotgun pleading counts that did not separate distinct claims of different failures to warn or separate distinct theories, and directing the plaintiff to separate the claims in an amended pleading and to "separate his apparent and actual agency theories into two separate counts of vicarious liability" so as to "promote clarity").

Count I, however, may also suffer from substantive deficiencies. Specifically, it may not adequately allege a joint venture. To be clear, the dismissal of Count I, albeit without prejudice, is based on the impermissible comingling of claims, not substantive fatal flaws concerning the joint venture allegations. But because Gharfeh will most likely amend Count I to alleviate the shotgun pleading issue, the Court deems it logical to flag some potential concerns so that Gharfeh can, if he wishes, tighten up and clarify his joint venture allegations.

To state a joint venture claim, Gharfeh must allege: (1) the intention of the parties to create a joint venture; (2) joint control or right to control; (3) joint proprietary interest in the subject matter of the joint venture; (4) the right of all venturers to a share in the profits; and (5) the duty of both to share in the losses. *Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1354 (S.D. Fla. 2016). There are several reasons why Gharfeh may not have adequately pled a joint venture claim, under which Carnival would be liable

for any alleged negligence on the part of the shipboard physicians or medical staff.

First, Gharfeh has failed to allege that Carnival and the shipboard physicians or medical staff intended to enter into a joint venture. Gharfeh merely alleges that Carnival and the health care providers had a "joint intention" to "provide healthcare to the thousands of passengers who come aboard [Carnival's] ships to enjoy the cruise experience with the peace of mind that their medical and emergency healthcare needs are satisfied." [ECF No. 1, pp. 6–7 ¶ 15]. There are no allegations, for example, that Carnival and shipboard physicians or medical staff "entered into long term business arrangements . . . to provide medical services to cruise passengers and crewmembers for profit." *Terry v. Carnival Corp.*, No. 17-21036-CIV, 2017 WL 5135599, at *4 (S.D. Fla. Aug. 10, 2017) (denying motion to dismiss joint venture claim against Carnival where the plaintiff alleged that a physician "purposefully reached out to Defendant Carnival in Florida and entered into long term business arrangements . . . to provide medical services to cruise passengers and crewmembers for profit.").

In addition, Gharfeh does not allege that a document exists in which Carnival and the shipboard physicians or medical staff expressed their intent to enter into a joint venture. Nor has Gharfeh alleged that there is an oral agreement between the parties. *See Skeen v. Carnival Corp.*, No. 08-22618, 2009 WL 1117432, at **3–4 (S.D. Fla. April 24, 2009) (dismissing joint venture claim where plaintiff did not sufficiently allege intent through agreement to enter into a joint venture). To be sure, an express contract may

not be necessary to establish a joint venture. *See Terry*, 2017 WL 5135599, at *4 (citing *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 213 (11th Cir. 1991)).[1] Nevertheless, the Court is not foreclosed from *considering* the absence of an allegation about an express agreement when assessing whether the allegations sufficiently allege a plausible theory of joint venture liability.

Second, Gharfeh may not have adequately alleged sufficient facts to establish joint control or right of control. Gharfeh's allegations assert a respondeat superior relationship between Carnival and the shipboard physicians or medical staff. Specifically, Gharfeh alleges that Carnival had *sole* control over the medical facility and controlled everything from the medical decisions of the shipboard physicians and medical staff to the price and sale of medical services, supplies, and medication. [ECF No. 1, pp. 7, 12 ¶¶ 15, 21]. Gharfeh does *not* allege that Carnival and the shipboard physicians or medical staff jointly controlled or jointly had the right of control over any portion of the medical care provided to passengers. *C.f. Terry*, 2017 WL 5135599, at *4 (denying motion to dismiss joint venture claim against Carnival where the plaintiff alleged that "Carnival oversaw control over the medical facilities from a shoreside perspective and [the defendant physician] maintained day-to-day control over the ship facilities.").

---

[1] The Undersigned notes that, at least in the context of excursion or tour operators, there is a split in authority concerning whether an agreement is "central" to a "joint venture theory of negligence." *See Pucci v. Carnival Corp.*, 146 F. Supp. 3d 1281, 1292 (S.D. Fla. 2015) (collecting cases).

Third, Gharfeh's allegations about a joint proprietary interest may not plausibly satisfy that element. A joint proprietary interest "requires joint ownership of the subject matter of the contract[.]" *Mumford v. Carnival Corp.*, 7 F. Supp. 3d 1243, 1253 (S.D. Fla. 2014). Gharfeh alleges that "[t]he cruise line and the shipboard physicians and medical staff share a joint proprietary interest by billing passengers who receive medical services rendered by the medical staff with a unified billing system through the cruise line" and "[t]he cruise line and the physicians and medical staff therefore relied on a single billing system and unified strategy of advertisement on Carnival's website." [ECF No. 1, p. 8 ¶ 16].

But Carnival's billing system and advertising scheme may not establish a joint propriety interest in and of itself. For instance, in *Terry*, the court cited to allegations regarding Carnival's billing system in its analysis of the joint-propriety-interest factor, and did not dismiss the joint venture claim on that basis, but that case also involved allegations that the defendant physician "supervised the medical center, and invested his time and effort into the running of the medical center." *Terry*, 2017 WL 5135599, at *5. A similar allegation is not present here. Moreover, in tour excursion cases, courts finding a sufficient joint proprietary interest between a cruise ship and an excursion company had facts showing "a symbiotic ticketing and programming relationship with the cruise lines whose passengers they served." *Mumford*, 7 F. Supp. 3d at 1253. A similar "symbiotic" relationship between Carnival and the shipboard physicians or

medical staff in this case is not alleged.

Nevertheless, the Court **dismisses Count I without prejudice** because of the comingling. Plaintiff may file an amended complaint within 14 days of entry of this Order. He may also decide to improve the joint venture allegations.

### Count III

In Count III, Gharfeh brings a negligence claim against Carnival for "failing to provide reasonable medical facilities" aboard the *Freedom*. [ECF No. 1, p. 28 ¶ 64]. Carnival argues that it "did not have a duty to provide reasonable medical facilities onboard its ship," but that it's only duty was to "provide a qualified and competent physician." [ECF No. 12, p. 11]. Carnival, however, relies upon cases that applied the now-outdated rule set forth in *Barbetta*, which *Franza* declined to adopt.[2]

As *Franza* explains, "the cruise lines have chosen quite deliberately to enter the business of medicine, often in a large way, and they reap the tangible benefits of this business strategy." *Franza*, 772 F.3d at 1247. "*Barbetta's* assumption that cruise lines lack any medical expertise is difficult to accept in light of the industry's decision to construct, outfit, and staff medical centers onboard its ships." *Id.* Therefore, the Eleventh Circuit concluded, "it seems hardly anomalous to *require cruise lines to bear the*

---

[2]      *See, e.g., Hill v. Celebrity Cruises, Inc.*, No. 09-23815-CIV-MORENO, 2010 WL 11442595, at *4 (S.D. Fla. Sept. 14, 2010) (relying upon *Barbetta* as "limit[ing] the ship's responsibility in the event the doctor it employed is negligent and specifies that the doctor's negligence is not imputed to the ship.").

*burden of this choice*." *Id.* (emphasis added).

In light of *Franza*, the Court **denies** Carnival's motion to dismiss Count III.

## Count IV

Carnival seeks to dismiss Gharfeh's claim that the cruise ship operator failed to evacuate him when he was in need of urgent or emergent medical care. It contends that Carnival did not owe a duty to evacuate Gharfeh. But, once again, Carnival relies upon pre-*Franza* cases to support its dismissal argument.

Similar to this case, the plaintiff in *Franza* alleged that "Royal Caribbean, by and through its medical personnel," breached its duty of care in several ways, including by "failing to evacuate [the decedent] from the vessel for further care in a timely manner." *Franza*, 772 F.3d at 1254. The Eleventh Circuit held that "[i]f proven, these allegations could establish a breach of even a modest duty of care, framed by the particular circumstances of the case." *Id.*[3]

Gharfeh has likewise alleged a viable claim that Carnival breached its duty of reasonable care by not timely evacuating him. The issue will be whether Defendants acted reasonably under the circumstances. That is a fact-based determination. But, for now, Gharfeh has sufficiently alleged a viable claim based on a permissible theory, so

---

[3] And at least one pre-*Franza* case shows that a plaintiff may have a viable claim against a cruise ship that fails to timely evacuate a sick passenger. *See Rinker v. Carnival Corp.*, 836 F. Supp. 2d 1309, 1316 (S.D. Fla. 2011) (denying Carnival's motion for summary judgment on failure to timely evacuate passenger claim because of existence of genuine factual issue about whether Carnival's failure to comply with the plaintiff's husband's request for evacuation was reasonable under the circumstances).

the Undersigned therefore **denies** Carnival's motion to dismiss Count IV.

## Count V

In Count V, Gharfeh alleges negligent hiring, retention, monitoring, and training of the onboard medical staff. Carnival challenges the allegations of negligent hiring, selection, and retention on pleading grounds but he challenges only the claims for negligent monitoring and training on legal grounds -- i.e., it says these are not legally viable claims because "[t]here is no obligation for a carrier to monitor or train the onboard physician or medical staff it provides for its passengers." [ECF No. 12, p. 15].

But Carnival again cites pre-*Franza* cases to support its argument, and the Undersigned is not convinced. *Franza* recognized that, as a general matter, employers may influence the medical decisions of medical professionals "through hiring criteria, training, formal practice guidelines, hierarchical supervision structures, peer review groups[,] and disciplinary measures." *Franza*, 772 F.3d at 1241. *Franza* then rejected the "second pillar" supporting the *Barbetta* decision, namely, "that the scope and nature of a cruise line's expertise renders it unable to *supervise* a medical professional." *Id.* at 1243 (emphasis added). The Eleventh Circuit then said: "Because, twenty-six years after *Barbetta*, we now think *a shipowner could plausibly supervise a ship's medical employees* in places near and far, we reject the sweep of the rule's final rationale." *Id.* at 1248 (emphasis added). Therefore, if the factual allegations were established, *Franza* would recognize as a permissible claim a failure to competently monitor (supervise) or train

on-board medical staff.

To state a cause of action for the tort of negligent hiring or retention, a plaintiff must allege that "(1) the agent/employee/contractor was incompetent or unfit to perform the work; (2) the employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury." *Witover v. Celebrity Cruises, Inc.*, 161 F. Supp. 3d 1139, 1148 (S.D. Fla. 2016). To meet the second element, a plaintiff must plead sufficient facts showing that the employer was on notice of the "harmful propensities" of the person hired or retained. *Id.* The main difference between negligent hiring and negligent retention "is the time at which the employer is charged with knowledge of the employee's unfitness," i.e., before hiring (negligent hiring) or after hiring (negligent retention). *Id.*

Gharfeh's allegations, while somewhat conclusory, are sufficient to allege a claim for negligent hiring. He alleges that Carnival "knew or should have known to investigate Dr. Carvajal's educational credentials and training," and "prior employment with other cruise lines," which credentials, training, and experience Gharfeh claims were inadequate. [ECF No. 1, p. 35 ¶¶ 83–84]. Gharfeh also alleges that Carnival "knew or should have known of Dr. Carvajal's unfitness to provide adequate medical care to its shipboard passengers." [ECF No. 1, p. 36 ¶ 86]. And he alleges that the "shipboard physicians and medical staff did not have the mental temperament and analytical

abilities and did not have sufficient knowledge and training to properly diagnose or create a reasonable and appropriate plan for urgent or emergent care and treatment," which included "evacuation of the patient and getting Gharfeh to a medical center on an expedited basis appropriate for urgent or emergent care." [ECF No. 1, p. 36 ¶ 87].

Thus, the Court is not convinced by Carnival's argument that Gharfeh "alleges no facts . . . indicating that Carnival knew or should have known of any particular incompetence or unfitness on the part of the onboard medical personnel prior to the subject incident." [ECF No. 12, p. 17].

The Court reaches the same conclusion concerning Carnival's challenge to the negligent retention claim. The Complaint alleges that Carnival "knew or should have known not to retain incompetent physicians or medical personnel with insufficient experience in emergency medical care, including Defendant Carvajal." [ECF No. 1, p. 35 ¶ 86]. This is sufficient. To the extent that Carnival wishes to mount a head-on challenge to those allegations, it may seek to do so in a summary judgment motion.

The Court **denies** the motion to dismiss Count V.

### Count VI

Carnival seeks to dismiss Gharfeh's claim for breach of third party beneficiary contract, which alleges that he was an intended third party beneficiary of a contract (believed to be written) between Carnival and its shipboard physicians and staff. Specifically, Gharfeh alleges that "[o]ne of the implied terms of this contract was that

the medical services provided by Carnival through the shipboard physicians and medical staff would be reasonable under the circumstances and within the standard of care." [ECF No. 1, p. 37 ¶ 94]. He then contends, in a conclusory manner, that *both* Carnival and the physicians and medical staff breached the contract by myriad acts of medical negligence.

Gharfeh's theory is illogical. His third party beneficiary claim is based on a contract between Carnival and its shipboard physicians, and the obligations he cites as being breached flow from the physicians and medical personnel's alleged failures. And yet his third party beneficiary claim is solely against **Carnival.**

To state a third-party beneficiary claim, the plaintiff must allege: "1) the existence of a contract in which the claimant is not a party; 2) an intent by the contracting parties that the contract primarily and directly benefits the plaintiff; 3) a breach of that contract by one party; and 4) damages resulting from the breach." *Ure v. Oceania Cruises, Inc.*, No. 14-21340-CIV, 2014 WL 5523122, at *5 (S.D. Fla. Oct. 31, 2014). If the plaintiff wants to hold a cruise ship liable under a third-party beneficiary theory, then the plaintiff must allege that the *cruise line*, and not just the doctors, breached the contract between them. *Id.* (dismissing third-part beneficiary claim against cruise ship where plaintiff alleged that doctor breached an agreement, but not that Oceania breached an agreement); *see also Hung Kang Huang v. Carnival Corp.*, 909 F. Supp. 2d 1356, 1362 (S.D. Fla. 2012) (same, involving a third-part beneficiary claim against Carnival); *Rinker v.*

*Carnival Corp.*, 753 F. Supp. 2d 1237, 1244 (S.D. Fla. 2010) (same).

Here, although Gharfeh alleges in a conclusory manner that both Carnival *and* its shipboard physicians and medical staff breached the contracts between the parties, Gharfeh cannot plausibly allege that *Carnival* breached any contract. According to Gharfeh, Carnival contracted with the shipboard physicians and medical staff to provide medical care on Carnival's ship. Gharfeh alleges that the subject of that contract "was that *the shipboard physicians and medical staff would provide medical services* onboard Carnival's cruise ship for the benefit of Carnival's cruise passengers." [ECF No. 1, p. 37 ¶ 92 (emphasis added)]. Gharfeh also describes one of the implied terms of the contract as being "that the medical services provided by Carnival *through the shipboard physicians and medical staff* would be reasonable under the circumstances and within the standard of care." [ECF No. 1, p. 37 ¶ 94 (emphasis added)].

Gharfeh does not allege any contractual obligations on Carnival's part. Nor may an obligation be implied. *See Gentry v. Carnival Corp.*, No. 11-21580-CIV, 2011 WL 4737062, at *9 (S.D. Fla. Oct. 5, 2011). In the absence of any contractual duties, Carnival simply could not have committed any breach and, thus, cannot be held liable under a breach of contract theory. *See id.* at *8–9 (dismissing breach of contract based on third party beneficiary theory that failed to include allegations of specific contractual provisions imposing a duty on Carnival that were breached).

Furthermore, Gharfeh's claim is based on a contract between Carnival and its

shipboard physicians and medical staff. [ECF No. 1, p. 37 ¶¶ 91–94]. Examples of the types of obligations owed by a shipowner to its medical staff under such a contract are payment and benefits. The obligations cited by Gharfeh, however, relate to the provision of medical care to Gharfeh by the shipboard physicians and medical staff who were contractually obligated to provide care to passengers. Therefore, any breach of the contract by virtue of negligent medical care could have been committed by the medical staff only.

In addition, although Gharfeh alleges that there could have been implied-in-fact terms of a contract, Gharfeh has not pled what obligation owed by Carnival to the medical staff could have caused him damage. In any event, this theory has been rejected in the context of a claim for breach of contract based on a third-party beneficiary status. Significantly, Gharfeh has not cited any on-point case supporting his theory that a passenger on a cruise ship is a third party beneficiary of a contract between the ship owner and the onboard physicians and medical staff and can bring a claim for medical malpractice against the ship owner for acts committed by the doctors and medical staff based on an implied term in the contract.

In his response, Gharfeh argues that the law cited by Carnival pre-dates *Franza*. [ECF No. 22, p. 19]. But *Franza* is inapposite because it was limited to the viability of claims for vicarious liability for medical personnel and because the case involved a *tort* claim (for medical negligence), not a claim for breach of contract. To illustrate, Judge

Gayles reconsidered only part of his decision in *Ure v. Oceania Cruises, Inc.* in light of *Franza*, leaving his dismissal of the third party beneficiary claim unchanged. *See Ure v. Oceania Cruises, Inc.*, No. 14-21340-CIV, 2014 WL 6611586, at *1 (S.D. Fla. Nov. 20, 2014).

In short, the Court **dismisses** Count VI, albeit **without prejudice**. If Gharfeh and his counsel can cobble together a viable claim against Carnival under a third party beneficiary theory consistent with their Rule 11 obligations, then he may file an amended complaint asserting that type of claim within 14 days.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on January 22, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to:**</u>
All Counsel of Record